IN THE UNITED STATES DISTRICT COURT

DISTRICT OF IDAHO

| | | |
|---|---|---|
| DAVID L. BURLING, | ) | Case No. CV-08-43-E-EJL |
| | ) | |
| Plaintiff, | ) | MEMORANDUM ORDER |
| | ) | |
| v. | ) | |
| | ) | |
| REAL STONE SOURCE, LLC, dba | ) | |
| ROX PRO, | ) | |
| | ) | |
| Defendant. | ) | |
| ——————————————————— | ) | |

Pending before the Court in the above entitled matter are the parties' cross-motions for summary judgment and partial summary judgment, respectively. The parties have submitted responsive briefing on both motions and the matters are now ripe for the Court's consideration. Having fully reviewed the record herein, the Court finds that the facts and legal arguments are adequately presented in the briefs and record. Accordingly, in the interest of avoiding further delay, and because the Court conclusively finds that the decisional process would not be significantly aided by oral argument, this motion shall be decided on the record before this Court without oral argument. Local Rule 7.1(d)(2).

**Factual and Procedural Background**

Plaintiff David L. Burling's complaint alleges a violation of the Fair Labor Standards Act ("FLSA"), 29 U.S.C. § 201 *et seq*., for failure to pay overtime compensation. (Dkt. No. 1). Mr. Burling, was employed as a sales representative from March 15, 2006 to November 29, 2007 by Defendant Real Stone Source, LLC, d/b/a Rox Pro ("Real Stone"). Real Stone is a distributor of Rox Pro products which is a natural modular stone system used in construction. (Dkt. No. 28, Dkt.

No. 27-3, p. 37).  Real Stone products are distributed exclusively through a network of local dealers

from whom the ultimate consumer buys the product.  (Dkt. No. 26, Ex. E).  Mr. Burling was hired

as a Real Stone sales representative for a seven state area comprised of Washington, Oregon, Idaho,

Montana, Wyoming, Utah, and Colorado.  Mr. Burling was tasked with contacting existing and

potential local dealers and pitching Real Stone's products to them.  For prospective local dealers,

Mr. Burling's pitch was in an effort to get them interested in serving as a local dealer of Real Stone

products.  Once interested, Real Stone would determine whether the prospective dealer met its

qualifications and, if so, approve them as a local dealer.  For existing dealers, Mr. Burling continued

to educate them on Real Stone Products and also aided them in selling Real Stone products through

various efforts including promotions and outreach to consumers.

     Real Stone's has alleged as an affirmative defense that it was exempt from the FLSA

overtime compensation requirement because Mr. Burling's job fell into either the outside salesman

or an administrative employee exemptions of the FLSA.  Mr. Burling has filed a motion for partial

summary judgment dismissing Real Stone's affirmative defense.  (Dkt. No. 25, p. 2).  Real Stone

has filed a motion for summary judgment seeking a ruling as a matter of law that one of the

exemptions applies here to preclude Mr. Burling's FLSA claim.  (Dkt. No. 30).

## Standard of Law

     Motions for summary judgment are governed by Rule 56 of the Federal Rules of Civil

Procedure, which provides, in pertinent part, that judgment "shall be rendered forthwith if the

pleadings, depositions, answers to interrogatories, and admissions on file, together with the

affidavits, if any, show that there is no genuine issue as to any material fact and that the moving

party is entitled to a judgment as a matter of law."  Fed. R. Civ. P. 56(c).  Under Rule 56 summary

judgment is mandated if the non-moving party fails to make a showing sufficient to establish the existence of an element which is essential to the non-moving party's case and upon which the non-moving party will bear the burden of proof at trial. See Celotex Corp v. Catrett, 477 U.S. 317, 322 (1986). If the non-moving party fails to make such a showing on any essential element, "there can be no `genuine issue of material fact,' since a complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial." Id. at 323.[1]

Moreover, under Rule 56, it is clear that an issue, in order to preclude entry of summary judgment, must be both "material" and "genuine." An issue is "material" if it affects the outcome of the litigation. An issue, before it may be considered "genuine," must be established by "sufficient evidence supporting the claimed factual dispute . . . to require a jury or judge to resolve the parties' differing versions of the truth at trial." Hahn v. Sargent, 523 F.2d 461, 464 (1st Cir. 1975) (quoting First Nat'l Bank v. Cities Serv. Co. Inc., 391 U.S. 253, 289 (1968)). The Ninth Circuit cases are in accord. See, e.g., British Motor Car Distrib. v. San Francisco Automotive Indus. Welfare Fund, 882 F.2d 371 (9th Cir. 1989). When applying this standard, the court must view all of the evidence in a light most favorable to the non-moving party. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 255 (1986); Hughes v. United States, 953 F.2d 531, 541 (9th Cir. 1992).

---

[1] See also, Rule 56(e) which provides, in part:

> When a motion for summary judgment is made and supported as provided in this rule, an adverse party may not rest upon the mere allegations or denials of the adverse party's pleadings, but the adverse party's response, by affidavits or as otherwise provided in this rule, must set forth specific facts showing that there is a genuine issue for trial. If the adverse party does not so respond, summary judgment, if appropriate, shall be entered against the adverse party.

**Discussion**

I.      The FLSA:

The FLSA requires an employer to pay overtime compensation to employees who work more than forty hours per week unless certain FLSA exemptions apply.  See 29 U.S.C. § 207(a)(1).  "An employer who claims an exemption from the FLSA has the burden of showing that the exemption applies."  Bothell v. Phase Metrics, Inc., 299 F.3d 1120, 1124 (9th Cir. 2002) (internal quotation and citation omitted).  In determining whether an exemption applies, the "FLSA is construed liberally in favor of employees; exemptions 'are to be narrowly construed against the employers seeking to assert them....'"  Cleveland v. City of Los Angeles, 420 F.3d 981, 988 (9th Cir. 2005) (citing Arnold v. Ben Kanowsky, Inc., 361 U.S. 388, 392 (1960); Klem v. County of Santa Clara, 208 F.3d 1085, 1089 (9th Cir. 2000).  "[A]n FLSA exemption will not be found 'except in contexts plainly and unmistakably within the given exemption's terms and spirit.'"  Id. (citation and brackets omitted); see also Bothell v. Phase Metrics, Inc., 299 F.3d 1120, 1124 (9th Cir. 2002) ("Because the FLSA is to be liberally construed to apply to the furthest reaches consistent with Congressional direction" the "FLSA exemptions are to be narrowly construed against employers and are to be withheld except as to persons plainly and unmistakenly within their terms and spirit.")).

The parties here do not seem to dispute that Mr. Burling exceeded the forty hours per week.  Instead, the central issue on both parties' motions is whether the FLSA's outside salesman and/or administrative employee exemptions preclude Mr. Burling's claims.  The parties differ on how they characterize Mr. Burling's primary job duty.  Mr. Burling argues he had no involvement in any actual sales of the product or in the administration of Real Stone but was instead only responsible for marketing and promoting the product.  Real Stone counters that the primary duty of its sales

---

representatives was to make sales and that Mr. Burling exercised independent discretion and judgement during his employment as a sales representative.

    A.    <u>Outside Salesman Exemption</u>

The FLSA's overtime compensation requirement does not apply to employees who are characterized as an "outside salesman" which is defined in the regulations as:

> (a) The term "employee employed in the capacity of outside salesman" in section 13(a)(1) of the Act shall mean any employee:
> > (1) Whose primary duty is:
> > > (I) making sales within the meaning of section 3(k) of the Act, or
> > > (ii) obtaining orders or contracts for services or for the use of facilities for which a consideration will be paid by the client or customer; and
> > (2) Who is customarily and regularly engaged away from the employer's place or places of business in performing such primary duty.
>
> (b) The term "primary duty" is defined at § 541.700. In determining the primary duty of an outside sales employee, work performed incidental to and in conjunction with the employee's own outside sales or solicitations, including incidental deliveries and collections, shall be regarded as exempt outside sales work. Other work that furthers the employee's sales efforts also shall be regarded as exempt work including, for example, writing sales reports, updating or revising the employee's sales or display catalogue, planning itineraries and attending sales conferences.

29 C.F.R. § 541.500. The FLSA defines the words "sale" or "sell" to include "any sale, exchange, contract to sell, consignment for sale, shipment for sale, or other disposition." 29 U.S.C. § 203(k). The interpretive regulations specify that this includes "the transfer of title to tangible property, and in certain cases, of tangible and valuable evidences of intangible property." 29 C.F.R. § 541.501(b).

The parties dispute the analysis applicable to this exemption in light of the differing approaches in the sales representative cases cited by both parties. Mr. Burling pointing to cases where the sales representatives were found not to be exempt outside salespersons because they never actually made any sales. (Dkt. No. 25, p. 6); <u>see</u> <u>Amendola v. Bristol-Myers Squibb Co.</u>, 558

F.Supp.2d 459 (S.D.N.Y. 2008); <u>Ruggeri  v. Boehringer-Engelheim Pharmaceuticals, Inc.</u>, 2008 U.S. Dist. LEXIS 92659 (D. Conn. Nov. 13, 2008).  In these cases, the courts looked first to whether or not the employee actually made sales before considering whether the employee's primary duty was  making sales or obtaining orders or contracts and who is customarily and regularly engaged away from the employer's place of business when performing such primary duty.  <u>See</u> 29 C.F.R. § 541.500.  These cases rely upon the FLSA's definition of "sale," 29 U.S.C. § 203(k), and the interpreting regulations, 29 C.F.R. § 541.501.

Real Stone argues the cases cited by Mr. Burling impose too much emphasis on the literal definition of sales and, instead, argue the Court should use the indicia of sales approach taken in district court cases out of California.  (Dkt. No. 32, pp. 7-9); <u>see</u> <u>Barnick v. Wyeth</u>, 522 F.Supp.2d 1257 (C.D. Cal. 2007), <u>D'Este v. Bayer Corp.</u>, 2007 U.S. Dist. LEXIS 87229 (C.D. Cal. Oct. 9, 2007), <u>Menes v. Roche Laboratories Inc.</u>, 2008 U.S. Dist. LEXIS 4230 (C.D. Cal. Jan. 7, 2008).  In particular, in <u>Barnick</u>, the Court looked to an FLSA case where the Western District of Michigan federal court identified certain indicia of an outside salesperson:  (1) "[T]he job was advertised as a sales position and the employee was recruited based on sales experience and abilities, "(2) "Specialized sales training, " (3) "Compensation based wholly or in significant part on commissions," (4) "Independently soliciting new business," (5) "[R]eceiving little or no direct or constant supervision in carrying out daily work tasks." <u>Barnick</u>, 522 F.Supp.2d at 1262 (quoting <u>Nielsen v. Devry, Inc.</u>, 302 F.Supp.2d 747, 756-58 (W.D. Mich. 2003)).  Mr. Burling counters that this indicia of sales approach does not apply unless the Court first determines that he actually made sales as defined by the FLSA and the interpreting regulations.  (Dkt. No. 34) (citing <u>Ruggeri</u> and <u>Amendola</u> *supra*).

This Court finds the cases cited by Mr. Burling to be the correct analysis to apply here.  <u>See</u> <u>Kuzinski v. Schering Corp.</u>, 604 F.Supp.2d 385 (D. Conn. March 30, 2009).  Although the California District Court cases cited by Real Stone discuss the FLSA, they were applying California Labor Law.  Notably, the <u>Barnick</u> court recognized that there is a distinction between the FLSA and California Labor Law.  There, the court stated that the employee's argument that he was only promoting, not selling, because he never received commitments from the physicians was "likely a correct application of the distinction between promotion and sales laid down by the Department of Labor and several federal courts with regard to the FLSA" but that it did not apply to the California Labor Law.  <u>Barnick</u>, 522 F.Supp.2d at 1264.[2]  Where, as here, the case does not raise claims of California Labor Law but, instead, the FLSA, the analysis from cases applying the FLSA are more appropriately used.  As such the Court will first consider whether Mr. Burling made sales as defined by the FLSA.  <u>See</u> <u>Kuzinski v. Schering Corp.</u>, 604 F.Supp.2d 385 (D. Conn. March 30, 2009).[3]

_____

[2]     The Northern District of California, in an unpublished opinion, also recently recognized a distinction between the FLSA outside sales exemption and the California Labor Law.  <u>See</u> <u>Wong v. HSBC Mortg. Corp.</u>, 2009 WL 151014 *2 (N.D. Cal. Jan. 21, 2009) (refusing to exercise supplemental jurisdiction over state law claims).  There, the court stated:

> The federal test is "qualitative" in nature, focusing on a determination of whether an employee's 'primary duty' is sales and whether such employee is "customarily and regularly engaged away from his employer's place or places of business."  <u>See</u> <u>Ramirez v. Yosemite Water Co.</u>, 978 P.2d 2 (Cal. 1999).  By contrast, California law "differs substantially," because it employs a "quantitative method" focusing on whether the employee spends "more than half the number of hours worked" engaged in outside sales.

[3]     Were this Court to adopt Real Stone's indica of sale's approach, the result would be the same.  (Dkt. No. 32, pp. 10-11).  Many of the facts applicable to the five indicia factors are disputed by the parties.  However, in <u>Barnick</u>, the court recognized a "second mode of analysis" in determining whether an employee is an outside salesperson in boarder line cases, stating:

> In borderline cases the test is whether the person is actually engaged in activities directed toward the consummation of his own sales, at least to the extent of obtaining a commitment to buy from the person to whom he is selling. If his efforts are directed toward stimulating the sales of his company generally rather than the consummation of his own specific sales his activities are not exempt.

<u>Barnick</u>, 522 F.Supp.2d. at 1263 (quoting <u>Nielsen</u>, 302 F.Supp.2d at 759 (quoting C.F.R. § 541.504(b)(2)).  The <u>Barnick</u> court determined the case before it was not a borderline case and, regardless, the alternative analysis did not characterize the employee as an outside salesperson because the pharmaceutical representative's sales efforts were appropriately

_____

7 -     MEMORANDUM ORDER

1.    <u>Made Actual Sales</u>

Mr. Burling maintains that he never consummated any actual sales of Real Stone products and that all sales were made by Real Stone to local dealers and by local dealers to the ultimate consumer.  (Dkt. No. 25, p. 10); (Dkt. No. 34, p. 12).  Mr. Burling argues his job was marketing and promotion and that sales were ultimately handled between the dealer and Real Stone.  (Dkt. No. 25, p. 10); (Dkt. No. 34, p. 5).  Mr. Burling describes his job as researching new dealers, meting with dealers and customers to resolve problems and complaints, investigated warranty claims, developing customer relationships, and educating and promoting the products.  Essentially, Mr. Burling asserts his job was to drive sales through the dealers by way of education and promotions of the Real Stone products but that the actual sales were made directly from the customer to the local dealer who in turn purchased it from Real Stone.  (Dkt. No. 25, pp. 10-11).

Real Stone disagrees arguing Mr. Burling made actual sales as defined by the FLSA and that he has mischaracterized the facts regarding his employment.  (Dkt. No. 32, p. 4); (Dkt. No. 44, p. 12).  Real Stone contends it advertised and hired Mr. Burling for a position as an outside sales representative and that it provided substantial and extensive sales training that included mandatory sales conferences, sales mentoring, and sales demonstrations.  (Dkt. No. 30, p. 10); (Dkt. No. 32,

---

targeting the physicians who clearly control the product's ultimate purchase.  <u>Barnick</u>, 522 F.Supp.2d at 1264.  That is not the case here.  Mr. Burling's sales efforts are targeted at creating a network of local dealers and generating a market where the ultimate consumer is buying Real Stone products from the dealers.  Thus, Mr. Burling's efforts are not targeting those who control the products' ultimate purchase but, instead, targeted at creating a market for the products. (Dkt. No. 27-3, pp. 73-74) (Dec. James Motarex "Our job as salespeople is to present our company and product as something of value and therefore entice a potential customer to buy initially and then ongoing, either through additional acts of promotion in order to perpetuate the demand for that product so that our customers continue to buy from us and we continue to sell to them" and "use promotional tools to convince our customer's customer to buy the product and sell it to them.").  Mr. Burling's contacts with the consumer involved customer service, education, and promotion, not sales. (Dkt. No. 27-3, pp. 54-55, Burling Depo.).  As such, this Court finds this second analysis would be applicable here as this does appear to be a borderline case.  Further, because the record shows that Mr. Burling's "efforts are directed toward stimulating the sales of his company generally rather than the consummation of his own specific sales his activities are not exempt" and the Court would grant his motion for summary judgment on this exemption.  <u>Nielsen</u>, 302 F.Supp.2d at 759 (quoting C.F.R. § 541.504(b)(2).

p. 2).  Mr. Burling's primary job duty was not promotion, Real Stone asserts, but "to search for reputable building material dealers to purchase and sell Real Stone Products."  (Dkt. No 32, p. 5). Real Stone describes Mr. Burling's sales representative position as requiring that he locate dealers, create a product sales proposal and an initial stocking order suggestion, and sells the dealer an initial quantity of Real Stone product.  (Dkt. No. 44, p. 12).   Real Stone cites these initial sales proposals as evidencing Mr. Burling's sales to dealers.  (Dkt. No. 32, p. 5) ("A sales proposal is a specific document that identifies dealer-specific pricing for specific Real Stone products.").

The initial sales proposal, Real Stone argues, was generated or originated from Mr. Burling and then sent to Real Stone to be reviewed and finalized and generally approved and sent back to the dealer.   It would then serve as the essential terms and conditions for all future orders between the dealer and Real Stone.  (Dkt. No. 32, p. 5).  Following the initial sale by Mr. Burling, Real Stone asserts, Mr. Burling "causes the dealer to make additional purchases from Real Stone by persuading local architects, builders and masons to purchase Real Stone products from the dealer."  (Dkt. No. 44, p. 12).   In addition, Real Stone argues that Mr. Burling would make direct sales to the general public and aid existing dealers in filing out their orders.  (Dkt. No. 32, p. 6).  In sum, Real Stone contends Mr. Burling "engaged in very direct sales activities including researching, identifying and approving potential dealers to purchase Real Stone products, formulating sales proposals for potential and existing dealers, persuading existing dealers to purchase more Real Stone products, and making direct sales of Real Stone's products to the general public."  (Dkt. No. 32, p. 15).

The Court finds Real Stone has failed its burden of demonstrating that, as a matter of law, Mr. Burling was an exempt outside salesperson.  The facts in the record demonstrate that Mr. Burling did not make any sales.  The Court rejects Real Stone's theory that its sales representatives

were a part of every sale in their territory.  (Dkt. No. 27-3, pp. 109-111), (Dkt. No. 27-4, pp. 24, 51-52), (Dkt. No. 31-2, p. 103).  Mr. Burling's job was to create a network of local dealers, educate the local dealers and contractors about the product, and bolster consumer desire to purchase the product from the local dealers who in turn bought from Real Stone.  (Dkt. No. 27-3, pp. 94-96).  This is consistent in the depositions of both Mr. Burling and Mr. Motarex as well as Real Stone's "Sales Philosophy and Market Strategy" document.  (Dkt. No. 26-2, Ex. E), (Dkt. No. 27-3, pp. 96-111, Motarex Depo.), (Dkt. No. 27-3, pp. 54-66, Burling Depo.).  Both Mr. Burling and Mr. Motarex testified that Real Stone sales representatives were hired to establish a network of dealers in their territory, provide sales support to those dealers by promoting the products and educating the consumers, and engaging in further advanced marketing strategies to "create buzz" for the products and increase consumer purchases from the dealers.  (Dkt. No. 26-2, Ex. E).  In sum, to "generate" and/or "drive" sales to the local dealers.  (Dkt. No. 27-3, pp. 25-28), (Dkt. No. 31-2, pp. 93, 95-96).

However, the deposition of James Motarex contains statements that could be read to indicate that Real Stone sales representatives sold to the ultimate consumer.  In discussing Real Stone's market philosophy, Mr. Motarex stated that "[o]ur real job is to sell product to the end user through a distribution channel.  So if we're going to create support for the product, we have to create a distribution channel that gets it to the end user in the most practical, cost effective way."  (Dkt. No. 31-2, p. 100).  This statement, however, was made in the context of describing the creation and support for distribution networks to get the products to the consumer.  Mr. Motarex went on to explain that once the local dealers are in place, the sales representatives have to provide support for the products in the distribution channel by convincing consumers to buy the products:  "We go out into the field, and we sell the product to the consumer.  They still buy through the dealer, but it's us

---

selling our product, us selling our product to the end user." (Dkt. No. 31-2, p. 101). Therefore, even though Mr. Motarex uses the word "sell," it is in the context of convincing consumers to go to their local dealers and buy the Real Stone products, not the completion of a sale as defined by the FLSA. This interpretation of the sales representatives interaction with the consumer is supported by Mr. Motarex's other descriptions of the salesperson's job as "driving sales to the dealers" and "generating sales." (Dkt. No. 31-2, pp. 93, 95-96), (Dkt. No. 27-3, pp. 25-28).

Further, Real Stone's argument that the initial sales proposals were sales is not supported in the record. The initial sales proposals by a new local dealers were reviewed and approved solely by Real Stone with payments being made from the local dealer to Real Stone. (Dkt. No. 27-3, p. 56), (Dkt. No. 27-4, p. 54). Mr. Burling may have aided in negotiating and filling out the initial proposals but it was ultimately submitted to Real Stone for its review and approval. (Dkt. No. 27-3, pp. 46-55, 88-93). Though Mr. Burling may have suggested products and prices for the product sales proposals, Real Stone sales representatives did not have the authority to approve prices and/or complete sales without final approval by Real Stone. (Dkt. No. 43, pp. 3, 8); (Dkt. No. 27-3, pp. 91-92, Motarex Depo.). The fact that Real Stone may have often times deferred to Mr. Burling's discretion regarding the approval of a local dealer does not change the fact that it was Real Stone who granted the approval. (Dkt. No. 27-3, pp. 90-92).

As one example of a sale, Real Stone points to a transaction where a consumer, Kingdom Hall of Jehovah's Witnesses, purchased products directly from Real Stone instead of through a local dealer with Mr. Burling's assistance. This transaction appears to be a "rare" occurrence where Mr. Burling brokered a sale of Real Stone products between Real Stone and a consumer instead of directing the consumer to a local dealer. (Dkt. No. 27-3, pp. 27, 75), (Dkt. No. 31-2, p. 102). Even

at that, the "sale" was between Real Stone and the consumer, not Mr. Burling.  Similarly, Real Stone

argues that Mr. Burling often would bring a contractor to the dealer or negotiate with the dealer on

behalf of a contractor.  (Dkt. No. 31-2, p. 102).  Such actions, Real Stone contends, are "sales" as

defined by the FLSA.  These activities by Mr. Burling, however, are not Mr. Burling's sales but,

instead, business generated for the local dealer.  (Dkt. No. 27-3, pp. 25-28, 101).  The sales

themselves were completed between the contractor and the local dealer.  See 29 U.S.C. § 203(k);

29 C.F.R. § 541.501(b) ("sale" or "sell" include "any sale, exchange, contract to sell, consignment

for sale, shipment for sale, or other disposition" which includes "the transfer of title to tangible

property, and in certain cases, of tangible and valuable evidences of intangible property.").

Real Stone also points out that Mr. Burling submitted orders to Real Stone that he had

handwritten for local dealers.  (Dkt. No. 27-4, p. 54).  These "handwritten orders," however, appear

to be information that Real Stone would use to create a formal product sales proposal that would

then be given to the local dealer as a proposal, not an actual sale or even a purchase order for the

products.  (Dkt. No. 27-4, p. 54).[4]  Though Real Stone maintains that Mr. Burling had a hand in

---

[4]      On this point, Real Stone has supplied the declaration of Melanie Nardini who states that she personally
received on many occasions sales proposals drafted by Mr. Burling and sent to Real Stone via e-mail or facsimile and
that "Mr. Burling often faxed to Real Stone make-shift Sales Proposals on Purchase Order forms from a dealer's fax
machine."  (Dkt. No. 32-4).  In particular, Ms. Nardini's declaration attached an example of such a fax from a local
dealer named Interpace.  Mr. Burling has filed a motion to strike the declaration and attached exhibits of Ms. Nardini
on the grounds that the declaration lacks foundation.  (Dkt. No. 42).  In support of the motion to strike is an affidavit of
Mr. Burling stating that he did not "consummate any of these sales" and that the sales orders were prepared by the
individual local dealers.  (Dkt. No. 42-3).  Mr. Burling's affidavit further states that Ms. Nardini and others at Real Stone
instructed him to not assist in preparing product sales proposals or to take orders as it was against company policy and
all product orders had to go through company headquarters.  (Dkt. No. 42-3).  Real Stone objects to the motion to strike
arguing the declaration is based on personal knowledge and the exhibits are self-authenticating and has submitted a
second declaration of Ms. Nardini.  (Dkt. No. 45).  Real Stone did not dispute Mr. Burling's affidavit.

"A trial court can only consider admissible evidence in ruling on a motion for summary judgment," Orr v. Bank
of Am., 285 F.3d 764, 773 (9th Cir. 2002) (citations omitted), and a party opposing summary judgment "must set forth
specific facts showing that there is a genuine issue for trial."  Fed.R.Civ.P. 56(e) (emphasis added); see Lujan v. Nat'l
Wildlife Fed'n, 497 U.S. 871, 888 (1990) ("The object of [Fed.R.Civ.P. 56(e) ] is not to replace conclusory allegations
of the complaint or answer with conclusory allegations of an affidavit.").  Here, Real Stone has the burden of proving
the outside employee exemption applies.  Federal Rule of Civil Procedure 56(e) provides that "supporting or opposing

---

these sales, it has offered no admissible evidence to support its argument. Further, Mr. Burling has supplied a declaration that he was told by Real Stone employees to not take orders. (Dkt. No. 42-3). Real Stone has not disputed this portion of Mr. Burling's declaration. (Dkt. No. 45). As stated above the Court has rejected Real Stone's position that its sales representatives, such as Mr. Burling, were a part of every sale in their territory as a basis for applying the exemption.

Real Stone further characterizes Mr. Burling's promotional activities as being done in support of his sales activities such that his promotional work was incidental to and in conjunction with his sales. Real Stone points to 29 U.S.C. § 541.503(a) which provides "[p]romotional work that is actually performed incidental to and in conjunction with an employee's own sale or solicitations is exempt work." (Dkt. No. 44, p. 12). Real Stone characterizes Mr. Burling's promotional work as occurring only after he has located a dealer and made the initial sale. The record does not support this characterization. Neither party disputes that Mr. Burling engaged in his own research of his territory in order to determine to which potential local dealers to pitch the product. (Dkt. No. 27-3, p. 56). Real Stone argues this "pitch" is "selling" of the product. The Court disagrees. This "pitch" is not a "sale" as defined by the FLSA. See 29 U.S.C. § 203(k); 29 C.F.R. § 541.501(b). Mr. Burling did not receive commitments from the proposed dealers but, instead, submitted a recommendation to Real Stone to approve them as local dealers who could buy Real Stone products from Real Stone. If approved, the local dealer could then buy Real Stone products and sell them to

---

affidavit[s] must be made on personal knowledge, set out facts that would be admissible in evidence, and show that the affiant is competent to testify on the matters stated."

    The Court finds Mr. Burling's motion to strike is well taken. The statements made by Ms. Nardini regarding what Mr. Burling did or did not do outside of her presence are speculative and inadmissible. Thus the Court will not consider Ms. Nardini's recitation of how Mr. Burling acted during these particular transactions. As to the exhibits themselves, they appear to be business records and would likely be admissible but without Ms. Nardini's testimony they do not aid Real Stone's position. As such, the Court grants in part and denies in part Mr. Burling's motion to strike.

the ultimate consumer.  As determined above, only Real Stone could approve local venders as Real Stone dealers.

Finally, Real Stone argues the fact that it paid Mr. Burling a commission evidences that Mr. Burling made sales.  Mr. Burling received a salary and commission which amounted to a percentage of pay increase if the sales in his territory area exceeded a certain monetary value.  (Dkt. No. 27-3, pp. 69-74), (Dkt. No. 27-4, pp. 10-14).  The commission, however, was not tied to any particular sale but instead based on the total amount of sales of Real Stone products made by the local dealers to Real Stone in Mr. Burling's territory.  (Dkt. No. 27-4, p. 14).  This does not mean Mr. Burling made any sales but, instead, shows a payment structure that provided incentives for Mr. Burling to generate sales to the local dealers through education and promotion of the products.

Because the facts here do not demonstrate that Mr. Burling actually made sales, the Court finds the outside salesperson exemption does not apply.  Instead the facts show that Mr. Burling's primary duty was to promote and market the Real Stone brand in such a way so as to create a network of local dealers in his territory and to bolster a market for the products such that consumers were continually buying the products from the local dealers.  Accordingly, the Court will grant Mr. Burling's motion for partial summary judgment on this point.

B.    Administrative Exemption

An exemption from the overtime payment requirement exists for persons "employed in a bona fide executive, administrative, or professional capacity."  29 U.S.C. § 213(a)(1).  The federal regulations provide interpretative regulations that explain the terms used in the FLSA.  See 29 C.F.R. § 541.200.  The regulations provide that in order for the exemption to apply, the employer must prove that the employee is:

> (1) Compensated on a salary or fee basis at a rate of not less than $455 per week ... exclusive of board, lodging or other facilities;
> (2) Whose primary duty is the performance of office or non-manual work directly related to the management or general business operations of the employer or the employer's customers; and
> (3) Whose primary duty includes the exercise of discretion and independent judgment with respect to matters of significance.

See 29 C.F.R. § 512.200.  The parties do not dispute that Mr. Burling makes more than $455 but disagree as to whether the other requirements of this exemption are satisfied in this case.

1.  <u>Whose Primary Duty is Non-Manual Work Directly Related to the Management or General Business Operations</u>

The first requirement of the administrative employee exemption is that the employee's primary duty must be the "the performance of office or non-manual work directly related to the management or general business operations of the employer or the employer's customers."  29 C.F.R. § 541.200(a)(2).  "The term 'primary duty' means the principal, main, major or most important duty that the employee performs."  29 C.F.R. § 512.700(a).  In explaining the meaning of the phrase "directly related to management policies or general business operations," § 541.201 provides that "[t]o qualify for the administrative exemption, an employee's primary duty must be the performance of work directly related to the management or general business operations of the employer or the employer's customers."  29 C.F.R. § 541.201(a).  The regulations identify certain categories of work that constitute "work directly related to management or general business operations'" as work that:

> includes, but is not limited to, work in functional areas such as tax; finance; accounting; budgeting; auditing; insurance; quality control; purchasing; procurement; advertising; marketing; research; safety and health; personnel management; human resources; employee benefits; labor relations; public relations; government relations; computer network, internet and database administration; legal and regulatory compliance; and similar activities.

15 -   MEMORANDUM ORDER

29 C.F.R. § 541.201(b).

Mr. Burling states his primary job duty was marketing and promotion, but not non-manual work directly related to the management or general business operations of Real Stone.  (Dkt. No. 34, p. 13).  Instead, he maintains, his primary duty was the "day-to-day promotion of [Real Stone] products: Attending trade shows, building demo walls, meeting with masons and architects, solving customer problems and investigating warranty claims."  (Dkt. No. 34, p. 15).  Real Stone contends that Mr. Burling performed non-manual work directly related to the management of general business operations pointing to language in Amendola v. Bristol Myers Squibb Co., 558 F.Supp.2d 459, 473 (S.D.N.Y. 2008) stating:

> To satisfy the first requirement, "an employee must perform work directly related to assisting with the running or servicing of the business, as distinguished, for example, from working on a manufacturing production line or selling a product in a retail or service establishment.   The types of work that satisfy this first requirement include "advertising," "marketing," and "public relations" work."

Id. (quoting 29 C.F.R. § 541.201)[5], (Dkt. No. 44, p. 3).  Because Mr. Burling's own description of his job duties includes marketing, research, and promoting, Real Stone contends, the first requirement of the administrative employee exemption is satisfied.  (Dkt. No. 44, p. 4).  Mr. Burling counters that his primary duty was not related to the running of the business and/or determining the businesses overall course or policies.[6]

---

[5] The administrative/production dichotomy has been deemed "useful only to the extent that it helps clarify the phrase 'work directly related to the management policies or general business operations'" of the company or a customer. Heffelfinger v. Electronic Data Systems Corp., 580 F.Supp.2d 933, 954 (C.D. Cal. 2008) (quoting Bothell v. Phase Metrics, Inc., 299 F.3d 1120, 1126 (9th Cir. 2002) (citation omitted).  The Ninth Circuit in Bothell cautioned that the dichotomy should be employed as an analytical tool "only to the extent it clarifies the analysis." 299 F.3d at 1127 ("Only when work falls squarely on the production side of the line, has the administration/production dichotomy been determinative," (citations and quotations omitted)).

[6] Real Stone disputes that it must show Mr. Burling's primary duty was the running of the business.  (Dkt. No. 44, p. 6).  Mr. Burling uses the "running of the business" language quoting from Bratt v. County of Los Angeles, 912 F.2d 1066, 1070 (9th Cir. 1990).  (Dkt. No. 34, p. 13).  Here, the Court has applied the statutory language of the FLSA and

On this point the Court finds that genuine issues of material fact exist as to Mr. Burling's level of involvement with the management and general business affairs of Real Stone. Mr. Burling's own description of his job as researching and promoting the Real Stone brand, seems to fit into some of the job categories contained in 29 C.F.R. § 541.201(b). However, it is disputed in the record whether his research and promotion efforts are his primary duty and directly related to the management or general business operations of Real Stone. The parties disagree on the level of involvement Mr. Burling had in the general business affairs of Real Stone such as who was able to approve special circumstances with particular local dealers or contractors and who set Real Stone's sales policies. The record goes both ways in terms of Mr. Burling's impact on the general business of Real Stone. Their sales representatives, Real Stone argues, were a part of every sale and how they implemented Real Stone's general sales philosophy directly impacted Real Stone's general business. (Dkt. No. 27-3, pp. 109-111), (Dkt. No. 27-4, pp. 24, 51-52), (Dkt. No. 31-2, p. 103). Mr. Burling, on the other hand, contends he had little input on the management or general business of Real Stone or its customers as evidenced by the fact that he had to get approval from Real Stone for leave and expenses and was denied his request to create a central distribution center in his territory. (Dkt. No. 27-3, pp. 90-92), (Dkt. No. 35, pp 109-12, Burling Depo.). Because such questions of fact exist as to Mr. Burling's primary duty and whether it was directly related to Real Stone's management or general business operations, summary judgement is improper.

---

the applicable regulations in rendering its decision. See 29 C.F.R. § 541.201(a) ("[t]o qualify for the administrative exemption, an employee's primary duty must be the performance of work directly related to the management or general business operations of the employer or the employer's customers.").

17 -    MEMORANDUM ORDER

2.      Whose Primary Duty Includes the Exercise Discretion and Independent Judgement with Respect to Matters of Significance.

The next requirement provides that "[t]o qualify for the administrative exemption, an employee's primary duty must include the exercise of discretion and independent judgment with respect to matters of significance...[t]he term 'matters of significance' refers to the level of importance or consequence of the work performed." 29 C.F.R. § 541.202 (a).  "In general, the exercise of discretion and independent judgment involves the comparison and the evaluation of possible courses of conduct, and acting or making a decision after the various possibilities have been considered."  29 C.F.R. § 541.202 (a).  "The phrase 'discretion and independent judgment' must be applied in the light of all the facts involved in the particular employment situation in which the question arises.  Factors to consider when determining whether an employee exercises discretion and independent judgment with respect to matters of significance include, but are not limited to: whether the employee has authority to formulate, affect, interpret, or implement management policies or operating practices; whether the employee carries out major assignments in conducting the operations of the business; whether the employee performs work that affects business operations to a substantial degree, even if the employee's assignments are related to operation of a particular segment of the business; whether the employee has authority to commit the employer in matters that have significant financial impact; whether the employee has authority to waive or deviate from established policies and procedures without prior approval; whether the employee has authority to negotiate and bind the company on significant matters; whether the employee provides consultation or expert advice to management; whether the employee is involved in planning long- or short-term business objectives; whether the employee investigates and resolves matters of significance on behalf of management; and whether the employee represents the company in handling complaints,

arbitrating disputes or resolving grievances." 29 C.F.R. § 541.202 (b).  The regulations also indicate

what does not constitute the exercise of "discretion and independent judgment" in that the employee

must do "more than ... use [his] skill in applying well-established techniques, procedures or specific

standards described in manuals or other sources.... [or] perform[ ] other mechanical, repetitive,

recurrent or routine work."  29 C.F.R. § 541.202(e).

The regulations also address whether an employee can exercise discretion and independent

judgment even if he or she lacks final decision-making authority, providing:

> employees can exercise discretion and independent judgment even if their decisions
> or recommendations are reviewed at a higher level.  Thus, the term 'discretion and
> independent judgment' does not require that the decisions made by an employee
> have a finality that goes with unlimited authority and a complete absence of review.

29 C.F.R. § 541.202 (c).  In this context, the regulations specifically provide that a management

consultant who has "made a study of the operations of a business and who has drawn a proposed

change in organization" is exempt despite the fact that his plan is subject to review and revision by

his superiors before it is submitted to the client.  29 C.F.R. § 541.202 (c).[7]

Mr. Burling argues he did not exercise discretion and independent judgment as to matters

of significance or, alternatively, issues of fact exist on this point.  (Dkt. No. 34, p. 15-17).  In

---

[7]Section 541.202 (c) states:

> The exercise of discretion and independent judgment implies that the employee has authority to make
> an independent choice, free from immediate direction or supervision.  However, employees can
> exercise discretion and independent judgment even if their decisions or recommendations are reviewed
> at a higher level.  Thus, the term 'discretion and independent judgment' does not require that the
> decisions made by an employee have a finality that goes with unlimited authority and a complete
> absence of review.  The decisions made as a result of the exercise of discretion and independent
> judgment may consist of recommendations for action rather than the actual taking of action.  The fact
> that an employee's decision may be subject to review and that upon occasion the decisions are revised
> or reversed after review does not mean that the employee is not exercising discretion and independent
> judgment.

29 C.F.R. § 541.202 (c).

particular, Mr. Burling points out that he was supervised on a daily basis by Real Stone's Sales Manager James Motarex.  Mr. Burling further alleges that he was required to turn in weekly reports and itineraries, visit each dealer every two weeks, and needed approval from Mr. Motarex to take time off from work.  In addition, Mr. Burling states that he could not approve a prospective dealer as a Real Stone dealer, set policy, set or negotiate prices or shipping charges, bind Reals Stone in a contract, hire an assistant, expend funds exceeding $150.00 from his expense account, settle warranty claims, or create a regional distribution center in his territory.  (Dkt. No. 27-3, p. 90-92); (Dkt. No. 27-4, p. 56); (Dkt. No. 34, pp. 14, 16-17).

Real Stone counters that without disputing Mr. Burling's facts, these "*additional* facts... unambiguously demonstrate that [Mr. Burling] exercised sufficient discretion and independent judgment with respect to matters of significance during his employment at Real Stone...." (Dkt. No. 44, pp. 6-7) (emphasis in original).  In particular, Real Stone points to Mr. Burling's deposition where he stated that he "would do the research, then use [his] judgment to determine which dealers or which suppliers [he] would contact to pursue" and that he was responsible for his own direction most of the time.  (Dkt. No. 44, p. 7).  Real Stone notes other portions of the deposition which, they argue, show that Mr. Burling "set his own hours, generally provided his own direction, had discretion to dispense samples and use his expense account in the manner of his choosing, gave advise to Real Stone's customers on a variety of subjects from warranty work to product selection, and researched and used independent judgment to choose which potential dealers to pursue for Real Stone."  (Dkt. No. 44, p. 9).  Real Stone argues these "activities concern matters of critical significance to Real Stone's business" and "evince a high level of discretion and independent judgment."  (Dkt. No. 44, p. 9).  Real Stone also objects to Mr. Burling's claim that it exercised

control over his activities, arguing the minimal supervision it had did not preclude Mr. Burling from exercising sufficient discretion and independent judgment to qualify him for the administrative exemption.  (Dkt. No. 44, p. 11).

The Court finds in this case that genuine issues of material fact exist regarding whether Mr. Burling exercised discretion over matters of significance.  The parties seem to generally agree that Mr. Burling set his own daily schedule and, except in rare instances where Real Stone would schedule something, he was free to make decisions regarding how and to whom he would approach to pitch the Real Stone product based on his own research of the area.  (Dkt No. 27-3, p. 56), (Dkt. No. 31-2, pp. 50, 103).  The parties, however, do not agree regarding Real Stone's control over Mr. Burling.  Real Stone points to the discretion it afforded to Mr. Burling in how he sold the products; for example it allowed Mr. Burling to build displays as a way of showing the products to contractors.  (Dkt. No. 31-2, p. 103).  Mr. Burling counters that he could not: set policy, set prices, negotiate shipping charges, distribute Real Stone products, set up a distribution center in his territory, take a day off without approval from his daily supervisor, and/or have input on Real Stone's sales philosophy.  (Dkt. No. 27-4, p. 56), (Dkt. No. 27-3, p. 92), (Dkt. No. 34, p. 14).

Here the record shows that Real Stone had some level of control over Mr. Burling and although it may not have been a stringent hour by hour control it was more than just minimal oversight.  The record also shows Real Stone gave some flexibility and freedom to its sales representatives at least as to who they approached as potential local dealers, their daily schedules, and the particular approach each might take in promoting Real Stone's product lines.  (Dkt. No. 31-2, p. 50).  The deposition of James Motarex is replete with Real Stone's belief that the sales representative were given a great degree of latitude and often times the circumstances of the sales

representative's particular relationship with a dealer, or even ultimate consumer, would drive the approval, pricing, and terms with Real Stone. (Dkt. No. 27-3, p. 64), (Dkt. No. 31-2, pp. 50, 103). However, Real Stone's position that it had little control over Mr. Burling seems contrary to its assertion raised under the outside salesperson exemption that it provided substantial sales training, held mandatory sales conferences, and provided sales mentoring. (Dkt. No. 30, p. 10), (Dkt. No. 27, pp. 85-88), (Dkt. No. 35, pp. 81-85). Further, the record evidences that Real Stone was the only one with the authority to approve local vendors as Real Stone dealers. (Dkt. No. 27-3, pp. 91-92). The depositions of Mr. Burling and Mr. Motarex both indicate that Mr. Burling had no authority to negotiate prices on the products, and that the ultimate approval for new local dealers lied with Real Stone. (Dkt. No. 27-3, pp. 91-92, Motarex Depo.); (Dkt. No. 35, pp. 106-08, Burling Depo.).

Having reviewed the parties submissions and the record herein, the Court finds the answer to the question of whether Mr. Burling exercised discretion and independent judgment as to matters of significance depends on resolution of factual disputes between the parties. (Dkt. No. 27-4, p. 9). Accordingly, the motions for summary judgment are denied on this issue.

## ORDER

Based on the foregoing and being fully advised in the premises the Court **GRANTS IN PART AND DENIES IN PART** Plaintiff's Motion for Partial Summary Judgment (Dkt. No. 23) and **DENIES** Defendant's Motion for Summary Judgment (Dkt. No. 29).

Plaintiff's Motion to Strike (Dkt. No. 42) is **GRANTED IN PART AND DENIED IN PART**. The motion is granted as to the Declaration of Melanie Nardini and denied as to the attached Exhibits.

Trial remains set for July 21, 2009.  The parties are advised that this matter is set second to a criminal trial on this date.


DATED:  **June 24, 2009**

Honorable Edward J. Lodge
U. S. District Judge